**UNITED STATES ex rel. KUSMAN**

**v.**

**DISTRICT DIRECTOR OF IMMIGRA-TION AND NATURALIZATION AT PORT OF NEW YORK et al.**

United States District Court
S. D. New York.

Dec. 28, 1953.

542

Ira Gollobin, New York City, J. Edward Lumbard, U. S. Atty., Southern Dist. of N. Y., New York City, for relator.

Harold J. Raby, Asst. U. S. Atty., Lester Friedman, Attorney, Immigration and Naturalization, New York City, of counsel, for respondent.

WEINFELD, District Judge.

The relator brings this writ of habeas corpus to secure his release from Ellis Island, where he is being detained pending his deportation. He has been in custody since June 19, 1953, following his arrest on an immigration warrant charging him with membership in the Communist Party after his entry into the United States.[1] A prompt hearing was had, and on July 9, 1953, an order was entered sustaining the charge and directing his deportation. On July 31, 1953, his appeal was dismissed by the Board of Immigration Appeals. The relator since the entry of the final order of deportation has been held[2] without bond pursuant to the provisions of § 242(c) of the Immigration and Naturalization Act of 1952[3] (hereinafter referred to as the Act) which in pertinent part provides:

"When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States, during which period, at the Attorney General's discretion, the alien may be detained, released on bond in an amount and containing such conditions as the Attorney General may prescribe, or released on such other condition as the Attorney General may prescribe. Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or other release during such six-month period upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to effect such alien's departure from the United States within such six-month period."

The relator does not question the legality of the final order for his deportation nor the proceedings upon which it is based. He contends, rather, that the Attorney General has had a reasonable time following the entry of the final order—almost five months—to effect his deportation, and since it now affirmatively appears that it is well nigh impossible to deport him to any country within the six-month period referred to in § 242(c), or in a considerably longer period, there is no basis for his continued detention as an incident of deportation. Accordingly, he urges that further detention for the balance of the six months is punishment in violation of the Constitutional guarantee of due process. Relator also contends that he has made out a case for release on the ground that the Attorney General is not proceeding with reasonable dispatch.

█ At the threshold of inquiry is the challenge to the Court's power to review the detention of an alien during the six-month period save upon the specific ground enumerated in § 242(c), to wit, upon a "conclusive showing * * * that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances * * * to effect such alien's departure * * * within such six-month period."

In substance, the Government contends that the Attorney General's power to detain an alien during the six-month period is absolute and is unreviewable by the Courts, except in the enumerated instance. This contended for construction has heretofore been advanced with

---

1. § 241(a) (6) (C) of the Immigration and Naturalization Act of 1952, 8 U.S. C.A. § 1251(a) (6) (C).

2. Prior thereto and pending hearing of the charges, he was held without bond pursuant to the authority granted to the Attorney General under § 242(a) of the Act, 8 U.S.C.A. § 1252(a).

3. 8 U.S.C.A. § 1252(c).

respect to the substantially similar review provision found in § 242(a) of the Act relating to detention of aliens during the pendency of deportation proceedings and has been rejected. In United States ex rel. Yaris v. Esperdy, 2 Cir., 202 F.2d 109, 112, the Court of Appeals held that the Attorney General's discretion in keeping an alien in custody was judicially reviewable to the same extent as it was prior to the enactment of § 242(a). The Court found that the section provided "but an added statutory recognition of a basis for judicial review, not a limitation upon the power as it had existed."[4]

More recently, my colleague, Judge Dimock, in a persuasive opinion reached the same conclusion with respect to § 242(c).[5] While noting that § 242(a) applied to proceedings prior to the entry of an order of deportation, whereas § 242(c) applied to proceedings after the entry of such an order, he concluded there was no basis for a different result. I agree with his determination that the mention of one ground for review does not deprive the Court of its pre-existing power to review any cause of detention.

There are additional considerations which support the conclusion reached. Prior to the enactment of the Internal Security Act of 1950,[6] Congress had never referred to a specific period for detention of an alien pending efforts to execute the order of deportation. Section 23 of that Act for the first time provided that following the entry of an order of deportation "* * * the Attorney General shall have a period of six months from the date of such order * * * to effect the alien's departure from the United States, during which period, at the Attorney General's discretion the alien may be detained * * *." Section 242(c) of the Immigration and Naturalization Act of 1952, the successor and expanded section, contains a similar clause. Until the passage of these statutory provisions, the Court's power to review the detention of an alien whenever it appeared, following the lapse of a reasonable time, that his deportation was impossible or could not be effected in the foreseeable future, had been unquestioned.[7]

The rationale underlying the decisions was that detention was for the sole purpose of effecting deportation—an incident of administrative action in consummating the final order.[8] But once it was evident that deportation was not realizable in the foreseeable future, the continued detention of the alien was without cause; in effect, it constituted imprisonment in contravention of the Fifth Amendment.[9]

Obviously, what constituted a reasonable time depended upon the facts and circumstances of each case. Generally,

4. See also United States ex rel. Hyndman v. Holton, 7 Cir., 205 F.2d 228; United States ex rel. Belfrage v. Shaughnessy, D.C.S.D.N.Y., 113 F.Supp. 56; United States ex rel. Kwong Hai Chew v. Shaughnessy, D.C.S.D.N.Y., 113 F. Supp. 49.

5. United States ex rel. Blankenstein v. Shaughnessy, D.C., 117 F.Supp. 699. Justice Douglas in considering an application for bail by an alien detained under § 242(c) reached the same conclusion in respect to § 242(c) in Yanish v. Barber, 73 S.Ct. 1105. See also Rubinstein v. Brownell, D.C.Cir., 206 F.2d 449, 453 note 14.

6. 8 U.S.C.A. § 156.

7. United States ex rel. Ross v. Wallis, 2 Cir., 279 F. 401; Caranica v. Nagle, 9 Cir., 28 F.2d 955; Saksagansky v. Weedin, 9 Cir., 53 F.2d 13; Wolck v. Weedin, 9 Cir., 58 F.2d 928; In re Hanoff, D. C.Cal., 39 F.Supp. 169; United States ex rel. Janavaris v. Nicolls, D.C.Mass., 47 F.Supp. 201; Petition of Brooks, D.C. Mass., 5 F.2d 238; cf. United States ex rel. Ng Hen v. Sisson, D.C.S.D.N.Y., 220 F. 538.

8. Wong Wing v. United States, 163 U.S. 228, 235, 16 S.Ct. 977, 41 L.Ed. 140; Skeffington v. Katzeff, 1 Cir., 277 F. 129.

9. United States ex rel. Ross v. Wallis, 2 Cir., 279 F. 401, 403; cf. United States ex rel. Mezei v. Shaughnessy, 2 Cir., 195 F.2d 964, reversed on other grounds, 345 U.S. 206, 73 S.Ct. 625.

the Courts held that approximately two to four months was a reasonable period to detain an alien pending deportation efforts.[10] War-time conditions warranted detention for longer periods.[11]

Against this background of judicial determination, Congress enacted § 23 of the Internal Security Act of 1950 and § 242(c) of the 1952 Act, granting to the Attorney General a maximum period of six months to detain an alien pending efforts to execute a final order of deportation. Any detention beyond this period is automatically terminated, although the alien remains subject to supervision of the Attorney General.[12]

But there is nothing either in the language of the Act or its history which warrants the conclusion that Congress, by the enactment of § 242(c), also prescribed six months as the minimum period of detention, free of judicial review, where it conclusively appears that after the lapse of a reasonable time the deportation of the alien is neither possible nor foreseeable in the immediate future. That the six-month period is not an insulated minimum period of detention is underscored by the provision specifying habeas corpus when the Attorney General fails to proceed with reasonable dispatch to effect deportation. The function of the first six-month period is thus marked out as one to enable the Attorney General in the exercise of a broad discretion to find ways and means to execute the deportation warrant.[13] But when it is abundantly clear that deportation cannot be effected in the foreseeable future, that function is no longer served. Upon such a showing the Court is empowered to review the cause of detention as in the instance of failure to proceed with reasonable dispatch.[14]

Finally, the construction urged by the Government that the Congress intended to limit review to the single instance specified in § 242(c), thus depriving the alien of the right to seek judicial review of his continued detention on the ground that it constitutes "imprisonment under the guise of awaiting an opportunity for deportation"[15] raises such serious constitutional questions,[16] that such intent will not be ascribed to the legislation.[17]

Thus we come to the question as to whether the relator has sustained his burden of proof of showing that his continued detention is not for deportation purposes. It is necessary to consider the statutory scheme designed to expedite the deportation of aliens. The alien is given the privilege to designate the country to which he desires deportation. He is limited to a single choice. If the designated country is unwilling to accept him, the Attorney General is directed to deport him first to the country of which he is a "subject, national or citizen," or failing that, to send him to a series of specified countries, including

10. Ex parte Perkov, D.C.Cal., 45 F.Supp. 864; United States ex rel. Consola v. Karnuth, D.C.W.D.N.Y., 63 F.Supp. 727; United States ex rel. Ross v. Wallis, 2 Cir., 279 F. 401; Petition of Brooks, D.C.Mass., 5 F.2d 238.

11. Moraitis v. Delany, D.C.Md., 46 F. Supp. 425

12. United States ex rel. Lee Ah Youw v. Shaughnessy, D.C.S.D.N.Y., 102 F.Supp. 799; United States ex rel. Blankenstein v. Shaughnessy, D.C.S.D.N.Y., 117 F. Supp. 699.

13. Cf. In re Hanoff, D.C.Cal., 39 F.Supp. 169.

14. Cf. United States ex rel. Janavaris v. Nicolls, D.C.Mass., 47 F.Supp. 201.

15. United States ex rel. Ross v. Wallis, 2 Cir., 279 F. 401, 403.

16. See St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 52, 56 S. Ct. 720, 80 L.Ed. 1033; Ng Fung Ho v. White, 259 U.S. 276, 284–285, 42 S. Ct. 492, 66 L.Ed. 938; Estep v. United States, 327 U.S. 114, 119–120, 66 S.Ct. 423, 90 L.Ed. 567; Developments in the Law—Immigration and Nationality, 66 Harv.L.Rev. 643, 700.

17. Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 44 S. Ct. 336, 68 L.Ed. 696; Shapiro v. United States, 335 U.S. 1, 29–30, 68 S.Ct. 1375, 92 L.Ed. 1787.

that (a) from which he last entered into or embarked for the United States, (b) of his birth, (c) in which is now contained the place of his birth. But if none of the designated places will have him, or deportation there is "impracticable, inadvisable or impossible", then the Attorney General is empowered to deport him to any country—except one contiguous to the United States—which will accept him.[18] Thus, the burden of proof cast upon the relator is not only to show that the country of his choice will not accept him but that no country to which he is deportable under the Act will have him.

■ The papers presented on the present application abundantly establish that the relator cannot in the foreseeable future be deported either to the country of his choice or to the country of his birth or to any specified country to which the Attorney General is empowered to deport him.

The relator's application for a visa to the Union of Soviet Socialist Republics, the country of his choice, to which he applied promptly upon the entry of the order for his deportation, was denied. The stated ground of refusal was that the relator never was a citizen of that country. It appears that he was born in Estonia in 1909. He last entered the United States in August 1939. Estonia was incorporated into the Soviet Union in 1940. Apparently the USSR does not recognize any one as a citizen who was not a denizen of territory when it was joined to or annexed by the Soviet Union.

Furthermore, the relator's contention that for over thirty years the United States has not deported a single alien to Russia is not seriously disputed. The respondent's return to the writ concedes "that the Union of Soviet Socialist Republic has consistently declined to accept almost every former resident of its

territory in recent years as a deportee from the United States. Only two cases are known wherein the Russian Government has accepted into Russia proper deportees from the United States, one of such persons was a native of China, whereas the nationality of the other is unknown."

■ Hence, it appears that neither the country of his choice nor the country within which is now contained the place of his birth will accept him. Further, there is no independent Estonian Government which can accept the relator. But the relator's burden of proof does not end here. He is still required to show that no other country, to which the Attorney General is empowered to deport him, is likely to accept him or receive him in the foreseeable future. To make out his case, however, the relator does not have to apply to, and be rejected by, every country of the world. As already noted, he is limited to but a single choice, and in the event of rejection, the Attorney General must carry forward.[19] The alien makes out a prima facie case by presenting facts from which the inference may be drawn that there is no country to which he can be deported in the foreseeable future. Unless rebutted, he sustains his burden of proof.

The papers presented upon this application establish that there were 1,365 unenforceable warrants of deportation as of 1950 which involve people who came from territories within Soviet borders; two former Estonians who left their native soil before Russian annexation have been awaiting deportation for over a year; one other has been awaiting deportation for over six months. It is significant that the immigration authorities have not requested the relator to apply for travel documents to any other country after the rejection of his visa request by the USSR. The infer-

18. 8 U.S.C.A. § 1253(a).

19. The alien's duty, once the Attorney General designates a prospective country which may be willing, or has agreed, to accept him, is to cooperate by taking the necessary steps to secure the required travel documents. 8 U.S.C.A. § 1252(e).

ence is indeed strong that no other country is willing or prepared to accept relator. The difficulty in deporting subversive aliens to other countries has been long standing. The reason is apparent. As Mr. Justice Jackson observed:

"A deportation policy can be successful only to the extent that some other state is willing to receive those we expel. But, except selected individuals who can do us more harm abroad than here, what Communist power will cooperate with our deportation policy by receiving our expelled Communist aliens? And what non-Communist power feels such confidence in its own domestic security that it can risk taking in persons this stable and powerful Republic finds dangerous to its security? World conditions seem to frustrate the policy of deportation of subversives. Once they gain admission here, they are our problem and one that cannot be shipped off to some other part of the world."[20]

The evidence to rebut the relator's contentions is meager indeed. The record compels the conclusion that the likelihood of deportation of relator in the foreseeable future, whether to a Communist controlled country or to one of the free countries of the world, is extremely remote. Nonetheless, the Attorney General is entitled to a reasonable opportunity to effectuate deportation, notwithstanding lack of success in other instances in the past. Respondent contends that Poland has recently accepted several non-Polish "subversives" but none of these is shown to have been a former native of Soviet acquired lands. Although five months have elapsed since the final order, nothing has been presented to indicate the slightest likelihood of agreement on the part of any country to accept the relator. Under these circumstances it cannot now be said that he is being detained for the purposes of deportation.

■ Separate and apart from the foregoing consideration, the relator has sustained his burden that deportation has not proceeded with reasonable dispatch as required by the statute. Soon after August 10, 1953, the immigration authorities had knowledge that relator's application for a visa had been denied by the Soviet Union. Relator has never requested a stay of deportation. The writ was argued before me late in October 1953, at which time I directed the issuance of interrogatories to clarify the issue of likely deportation of relator. The respondent's return to the writ and the memorandum of law in opposition thereto alleged that, notwithstanding the recognized present practical difficulties in deporting an alien to a place behind the Iron Curtain, " * * * a bona fide effort is being made to arrange for deportation * * *." In view of this allegation, the Court requested a further statement as to the efforts made to effect deportation under § 1253(a) of Title 8. Other than to note that the State Department, to which the matter had been referred in August 1953, had been unsuccessful in its efforts to obtain travel documents for relator to Estonia as a deportee, no other action of any kind was taken. The explanation now offered for this admitted lack of action—that it was "a necessary precautionary measure to avoid the possibility that an alien may be inadvertently deported during the pendency of a writ"— is hardly of substance. An appeal to the Courts to inquire into the cause of detention should not serve as an excuse to delay action required under the express terms of the statute. It is clear that the immigration authorities have failed to move with reasonable dispatch and the relator is entitled to the issuance of the writ.

The writ is sustained to the extent of affording the Attorney General an op-

20. United States v. Spector, 343 U.S. 169, 179–180, 72 S.Ct. 591, 597, 96 L.Ed. 863; also quoted in the Report of the President's Commission on Immigration & Naturalization, 1953, p. 225.

portunity to fix such terms and conditions for relator's release as he may deem appropriate. The order to be entered shall provide that in the event of failure to do so within two days the writ will be sustained unconditionally. Bail, however, will be fixed in the order to assure relator's appearance in the event the Government decides to appeal from this ruling.[21]

Settle order on one day's notice.

---

21. United States ex rel. Carapa v. Curran, 2 Cir., 297 F. 946, 36 A.L.R. 877; United States ex rel. Lee Kum Hoy v. Shaughnessy, D.C.S.D.N.Y., 115 F. Supp. 302, 310; United States ex rel. Ng Hen v. Sisson, D.C.S.D.N.Y., 220 F.

538; United States ex rel. Janavaris v. Nicolls, D.C.Mass., 47 F.Supp. 201, cited in United States ex rel. Potash v. District Director, 2 Cir., 169 F.2d 747, 751.

